**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

MILTON RHEA,

      Plaintiff,

v.                                  No. 2:17-cv-02267
                                       District Judge McCalla
                                       Magistrate Judge Claxton

WEST TENNESSEE VIOLENT CRIME AND
DRUG TASK FORCE; TIM HELLENDORFER, in his official capacity
As the Director of the WEST TENNESSEE VIOLENT
CRIME & DRUG TASK FORCE; GARRY G. BROWN,
DISTRICT ATTORNEY GENERAL FOR THE
28th JUDICIAL DISTRICT OF
TENNESSEE in his official capacity as a Member
of the Board of Directors of the WEST TENNESSEE
VIOLENT CRIME AND DRUG TASK FORCE;
DANNY H. GOODMAN JR., DISTRICT
ATTORNEY GENERAL FOR THE
29th JUDICIAL DISTRICT OF
TENNESSEE in his official capacity as a Member of
The Board of Directors of The WEST TENNESSEE VIOLENT
CRIME AND DRUG TASK FORCE; and AMY P. WEIRICH, DISTRICT
ATTORNEY GENERAL FOR THE 30th JUDICIAL DISTRICT OF
TENNESSEE, d/b/a DISTRICT ATTORNEY GENERAL OF
SHELBY COUNTY, in her official capacity as a Member of the
Board of Directors of the WEST TENNESSEE VIOLENT
CRIME AND DRUG TASK FORCE,

      Defendants.

---

### SECOND AMENDED COMPLAINT

---

      Comes now Plaintiff, Milton Rhea, (hereinafter "Plaintiff"), by and through undersigned

counsel, pursuant to Fed. R. Civ. P. 15, and files this Second Amended Complaint. Plaintiff

brings this civil action seeking back pay compensation against the Defendants pursuant to 29

Exhibit A

U.S.C. §201, et seq., the Fair Labor Standards Act ("FLSA") and states and alleges as follows:

<div align="center">**PARTIES**</div>

1.      Plaintiff, Milton Rhea, is an adult citizen and resident of Dyer County, Tennessee. During the applicable statutory period, Plaintiff was a special agent in the Interdiction Unit of the West Tennessee Violent Crime & Drug Task Force.

2.      West Tennessee Violent Crime & Drug Task Force (herein "West Tennessee Drug Task Force") is a local, intragovernmental entity that was created pursuant to a Joint Cooperation Agreement and an Inter-Agency Agreement, as authorized by T.C.A. § 12-9-104 *et seq.*

3.      Defendant, Tim Helldorfer, is sued in his capacity as the Director of the West Tennessee Violent Crime & Drug Task Force (herein "West Tennessee Drug Task Force") which is a local, intragovernmental entity that was created pursuant to a Joint Cooperation Agreement and an Inter-Agency Agreement, as authorized by T.C.A. § 12-9-104 *et seq.*

4.      The West Tennessee Drug Task Force is an unincorporated association which maintains its principal place of business at 1111 Mullins Station, Memphis, Shelby County, Tennessee.

5.      Defendant Garry G. Brown, is the District Attorney General For The 28th Judicial District Of Tennessee, and is named in his Official Capacity as a Member of the Board of Directors of the West Tennessee Violent Crime & Drug Task Force.

6.      Defendant Danny H. Goodman Jr., is the District Attorney General For The 29th Judicial District of Tennessee, and is named in his Official Capacity as a member of the Board of Directors of the West Tennessee Drug Task Force.

7.      Defendant Amy P. Weirich is the District Attorney General for the 30th Judicial

District of Tennessee, doing business as the Shelby County District Attorney General, and is named in her Official Capacity as a member of the Board of Directors of the West Tennessee Drug Task Force.

8.      At times relevant hereto, Defendants regularly held and/or exercised the authority to hire and fire agents/officers of West Tennessee Violent Crime & Drug Task Force.

9.      At times relevant hereto, Defendants regularly held and/or exercised the authority to determine the work schedules for the agents/officers of West Tennessee Violent Crime & Drug Task Force.

10.     At times relevant hereto, Defendants regularly held and/or exercised the authority to control the finances and operations of the West Tennessee Violent Crime & Drug Task Force.

11.     By virtue of having regularly exercised that authority to: (a) hire and fire agents/officers of West Tennessee Violent Crime & Drug Task Force; (b) determine the work schedules for the agents/officers of West Tennessee Violent Crime & Drug Task Force; (c) control the finances and operations of West Tennessee Violent Crime & Drug Task Force, and/or (d) responsible for paying employees of West Tennessee Violent Crime & Drug Task Force, including Plaintiff, Defendants are an employer as defined by 29 U.S.C. 201, *et seq.*

12.     At all times material hereto, Plaintiff was "engaged in commerce" within the meaning of §6 and §7 of the FLSA.

13.     Plaintiff is a former employee of Defendants and throughout his employment with Defendants, was a covered employee under the FLSA.

## JURISDICTION AND VENUE

14.     Plaintiff brings this action to redress failure to pay overtime in violation of the Fair Labor Standards Act, as amended, (29 U.S.C. §201, et seq., hereinafter called the "FLSA")

and Tennessee law to recover unpaid back wages, minimum wages, overtime wages, an additional equal amount of liquidated damages, front pay, interest, obtain declaratory relief, and reasonable attorney's fees and costs.

15.     This Court has personal jurisdiction over the Plaintiff, who is a resident of Dyersburg, Tennessee.

16.     This Court has personal jurisdiction over the Defendants, who do business in the State of Tennessee and reside in the State of Tennessee, and pursuant to the facts and circumstances set forth hereinbelow.

17.     Further, this Court has persona jurisdiction as to Defendant West Tennessee Violent Crime & Drug Task Force as Defendant removed this matter from state court to Federal Court.

18.     This Court has subject matter jurisdiction pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

19.     Venue is proper in this Court as Defendants may be found in this Judicial District, as they do business in this district, and the facts and circumstances which give rise to the causes of action contained in this Complaint occurred in Shelby County and this Judicial District.

20.     This Court has the authority to grant declaratory relief pursuant to the FLSA and the Federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-02.

## ALLEGATION OF FACTS AS TO WEST TENNESSEE VIOLENT CRIME AND DRUG TASK FORCE

21.     During all times relevant hereto, the District Attorneys General for the 28th, 29th, and 30th Judicial Districts of Tennessee were parties to and participated in the West Tennessee Judicial Violent Crime and Drug Task Force, pursuant to a Joint Cooperation Agreement entered

into under the provisions of Tennessee Code Annotated 12-9-101, et seq., The Interlocal Cooperation Act," and Tennessee Code Annotated §8-7-110. A copy of a Joint Cooperation Agreement signed in 2012 is attached to this Amended Complaint as Exhibit # A and incorporated by reference as if copied verbatim herein.

22.     The purpose of the Interlocal Cooperation Act is

> …. to permit local governmental units the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population, and other factors influencing the needs and development of local communities.

Tenn. Code Ann. § 12-9-102 (West)

23.     Pursuant to Tennessee Code Annotated §12-9-103(2), the West Tennessee Judicial Violent Crime and Drug Task Force is a "local government joint venture entity."

24.     Pursuant to Tennessee Code Annotated §12-9-112 the Drug Task Force was required to and did file an annual statement with the Tennessee Comptroller of the Treasury, Division of Local Government Audit, which set forth the names of all parties to the agreement, the annual revenue and expenses of any entity created under the agreement, and the other information required by the Comptroller.

25.     Because it is an intergovernmental cooperative pursuant to T.C.A. 9-3-212, the Drug Task Force was required to pay the State of Tennessee for any audit of the annual statement by the Tennessee Comptroller of the Treasury.

26.     Pursuant to Tennessee Code Annotated §8-7-103(5), each District Attorney General for the State of Tennessee must submit to the office of the executive director for the district attorneys general conference a written report specifying:

A. Each source from which funds were received by the Office of the district attorney general during the fiscal year;

B. The amount of funds received from each source; and

C. The disposition of such funds.

27.     No funds used to pay the salaries of the non-exempt employees of the Drug Task Force, including Plaintiff Rhea, were included in the report required under T.C.A. 8-7-103(5).

28.     Pursuant to the Joint Cooperation Agreement, the Drug Task Force is a joint undertaking which is governed by a joint Board of Directors consisting of the District Attorneys General for the 28th, 29th, and 30th Judicial Districts and the Director of the Drug Task Force. (Agreement Exhibit #A, page 2, para II)

29.     The Director of the Task Force is a local employee who was selected by the District Attorneys of the 28th, 29th, and 30th Judicial Districts.

30.     In addition to serving on the Board, the Director of the Drug Task Force is responsible for day to day management and supervision of the Drug Task Force.   (Agreement Exhibit #A, page 2, para II)

31.     At times relevant hereto, Defendants regularly held and/or exercised the authority to hire and fire agents/officers of West Tennessee Violent Crime & Drug Task Force. (Agreement Exhibit #A, page 2, para II)

32.     At times relevant hereto, the Director of the Drug Task Force regularly held and/or exercised the authority to determine the work schedules for the agents/officers of West Tennessee Violent Crime & Drug Task Force.

33.     The Drug Task Force is financed by grants, asset forfeitures, and fines.  The Drug Task Force receives funding from city, county, and Federal law enforcement agencies pursuant to Memoranda of Understanding and/or Joint Cooperation Agreements (Agreement Exhibit #A,

34.     The Drug Task Force is not financed by funds of the State of Tennessee.

35.     The funds used to finance the Drug Task Force are deposited with the County Trustee of Shelby County, Tennessee; all nonconfidential financial operations are expended through this fund under the administration of the Shelby County Mayor/executives.  (Agreement Exhibit #A, page 3, para IV)

36.     The directors of the Drug Task Force were required to submit requisitions for payment to the County Mayor/executives for goods and services, which could then be obtained through Shelby County, Tennessee, purchasing system.  (Agreement Exhibit #A, page 3, para IV)

37.     The Joint Cooperation Agreement provided that the Drug Task Force could acquire, hold, and use real and personal property.  (Agreement Exhibit #A, page 3, para. V)

38.     The Director of the Drug Task Force executes contracts binding the Drug Task Force thereunder.

39.     At times relevant hereto, Defendants regularly held and/or exercised the authority to control the finances and operations of the West Tennessee Violent Crime & Drug Task Force.

40.     The Joint Cooperation Agreement provides that some members of the Drug Task Force can be hired exclusively the Drug Task Force.  (Agreement Exhibit #A, page 2, para II)

41.     The Joint Cooperation Agreement provides that members of the Drug Task Force hired exclusively by the Drug Task Force are "assigned" to the task force by a District Attorney General.  (Agreement Exhibit #A, page 2, para II)

42.     The Joint Cooperation Agreement does not provide that members of the Drug Task Force hired exclusively by the Drug Task Force are employees of a District Attorney

General.

43.     Plaintiff Milton Rhea was hired exclusively by the Drug Task Force as a non-exempt special agent in the Interdiction Unit of the West Tennessee Violent Crime & Drug Task Force. Specifically, Plaintiff worked as a canine handler ("K-9") for West Tennessee Violent Crime & Drug Task Force and Shelby County Government.

44.     Tennessee Code Annotated 8-7-110(c)(1) provides that:

> (c) Notwithstanding any other law to the contrary concerning members of judicial district task forces relating to the investigation and prosecution of alleged drug violations, **if a claim or suit should be filed against an individual and it is proven that:**
>
> (1) At the time of the alleged incident the individual was a member of such task force who was properly certified to the board of claims pursuant to § 8-42-101(3)(C); and
>
> (2) The alleged liability arose out of the individual's activities as a task force member;
>
> then **it shall be conclusively deemed that the individual** was not an employee, agent or servant of a local government but was a **volunteer to the state.**

Tenn. Code Ann. § 8-7-110 (West) (emphasis added)

45.     Tennessee Code Annotated § 8-42-101(3)(C) provides that:

> "State employee" under this chapter and under title 9, chapter 8, also includes, **as a volunteer**, a person designated by the district attorney general of each judicial district as a member of a judicial district task force relating to the investigation and prosecution of drug cases. … **Task force members are not eligible for workers' compensation benefits from the state of Tennessee;**

Tenn. Code Ann. § 8-42-101 (West)

46.     Members of the Drug Task force are certified to the Tennessee Board of Claims pursuant to Tennessee Code Annotated § 8-42-101(3)(C) for the sole purpose of providing these

members with the safeguards against liability for activities arising out of that individual's activities as a task force member relating to the investigation and prosecution of drug violations pursuant to the provisions of T.C.A. § 9-8-307.

47.     Members of the Drug Task Force, including Plaintiff Rhea, who were certified to the Tennessee Board of Claims pursuant to Tennessee Code Annotated § 8-42-101(3)(C) are not eligible for workers' compensation benefits from the state of Tennessee because these members of the Drug Task Force are volunteers to the State of Tennessee; are not employees of the State of Tennessee; and are not paid by the State of Tennessee.

48.     The Joint Cooperation Agreement provides that members from other law enforcement agencies who are not hired exclusively by the Drug Task Force shall be assigned to the task force by agreement between the chief law enforcement official of the assigning jurisdiction and the Task Force Board of Directors. (Agreement Exhibit #A, page 2, para II)

49.     The West Tennessee Violent Crime & Drug Task Force did not answer to, and was not controlled by, any statewide official. Neither the State of Tennessee nor any state officials had any veto power over the Task Force.

50.     The Drug Task Force, as a separate entity, enters into Memoranda of Understanding and Joint Cooperation and Mutual Aid Agreements with counties, municipalities, and Federal agencies. A copy of the Joint Cooperation Agreement between the Drug Task Force and the 25th Judicial District Drug Task Force entered into in 2008 is attached to this Amended Complaint as Exhibit B and incorporated by reference as if copied verbatim herein. A copy of the Joint Cooperation Agreement entered into in 2015 is attached as Exhibit C.

51.     These Memoranda and Agreements provide that the West Tennessee Violent Crime and Drug Task Force receives funds from the counties, municipalities, and Federal

agencies which are parties to these contracts.

52. The Drug Task Force, as a separate entity, enters into Joint Cooperation Agreements with the Residence Agent in charge of the Drug Enforcement Agency. Exhibit D.

53. The Drug Task Force, as a separate entity, enters into Agreement with the United States Department of Justice and the Drug Enforcement Agency. Exhibit E.

54. During the time period Milton Rhea was an employee for Defendants, the Drug Task Force entered into a Joint Cooperation and Mutual Aid Agreement with the District Attorney Generals for the Twenty-Fifth, Twenty-Eighth, Twenty-Ninth, and Thirtieth Judicial districts and the 25th Judicial District Drug Task Force to form a Highway Criminal Interdiction Program. Attached is a copy of one of the Agreements.  Exhibit F.

55. The Board of the 25th Judicial Task Force is composed of Sheriffs from the counties of Fayette, Lauderdale and Tipton, Tennessee; and of Chiefs of Police Departments for the cities of Atoka, Ripley, Oakland, Munford, and Covington, Tennessee.

56. The Agreement forming the Highway Criminal Interdiction Program provided that:

> … the parties, by this agreement wish to avail themselves of the authority conferred by these acts and any other provisions of the law, to operate **jointly and corporately** within all of the participants areas of jurisdiction …

(Exhibit F, page 2) (emphasis added)

57. Pursuant to the Agreement forming the Highway Criminal Interdiction Program, officers assigned to the Highway Criminal Interdiction program, including Plaintiff Rhea, worked under the supervision of the Directors of the Drug Task Force and the Directors of the 25th District Task Force.   (Exhibit F) [pursuant to the FLSA and the Federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-02.]

58. The Drug Task Force, in its Policy and Procedures manual, acknowledges that it is bound by the Fair Labor Standards Act, Exhibit G.

59. The State of Tennessee Department of Finance and Administration recognized the Drug Task Force as being a non-state agency. Exhibit H.

60. Plaintiff filled out and submitted an application with Shelby County Government on October 12, 2009. Exhibit I.

## ALLEGATION OF FACTS AS TO PLAINTIFF MILTON RHEA

61. Plaintiff began his employment with Defendants on or about November 2, 2009 and was terminated on April 20, 2016. Plaintiff was paid $962.40 per week by defendants.

62. Prior to beginning his employment with Defendants, Plaintiff worked as a canine handler with the Ripley Police Department and had received instruction and training on matters such as how to bathe and groom his canine, how to administer the canine's medication, how to clean the canine's kennel, and the proper amount of exercise and food for the canine.

63. During his employment with Defendants, Plaintiff was a criminal interdiction canine officer.

64. During his employment with Defendants, Plaintiff lived in Dyersburg, Tennessee; he and his canine partner, Lea, had a ninety (90) minute commute to and from his home in Dyersburg to the Arlington, Tennessee area of I-40, where they were assigned to monitor traffic seeking to make a stop of any vehicle suspected to be caring illegal drugs.

65. During his employment with Defendants, Plaintiff's regular working hours were 3:00 AM to 1:00 PM, Tuesday through Friday.

66. Plaintiff's job duties and jurisdiction allowed for him to make a stop as to any moving vehicle violation, violent crime situation or any other police function.

67.     The time that a canine officer spends in caring for his canine partner is part of his job for which he/she is to be paid by the employer.

68.     Plaintiff did not receive any compensation for caring for the canine during his employment with Defendants.

69.     Plaintiff cared for and kenneled his canine partner, Leia, at his home in Dyersburg, Tennessee. Plaintiff was responsible for the canine at all times.

70.     On days when he worked, Plaintiff spent approximately seventy-five (75) minutes per day, caring for the canine while off-duty. This seventy-five minutes consisted of approximately thirty (30) minutes exercising the canine, approximately fifteen (15) minutes feeding the canine and cleaning his food and water bowls, and approximately thirty (30) minutes spraying down and cleaning the canine's kennel.

71.     On days Plaintiff was off-duty, he spent approximately two (2) hours of unpaid time caring for the canine. Plaintiff spent approximately seventy-five (75) minutes on training, obedience and exercise, approximately fifteen (15) minutes feeding the canine and cleaning his food and water bowls, and approximately thirty (30) minutes spraying down and cleaning the canine's kennel.

72.     Once a week Plaintiff spent approximately sixty (60) to ninety (90) minutes of unpaid time cleaning the canine's outside kennel with bleach and water. During this time Plaintiff also changed out the cedar shavings that lined the canine's kennel.

73.     Once a week Plaintiff spent approximately sixty (60) to ninety (90) minutes of unpaid time cleaning the canine's car kennel with bleach and water. Plaintiff also vacuumed the canine's hair out of the patrol car during this time.

74.     Once every two weeks Plaintiff spent approximately two (2) hours of unpaid time

bathing and brushing the canine.

75.     Once a month Plaintiff spent approximately fifteen (15) minutes of unpaid time administering the canine's medication.

76.     All of the off-duty time Plaintiff spent caring for the canine was necessarily and primarily for the benefit of Defendants.

77.     The off-duty time spent caring for the canine was an integral and indispensable part of Plaintiff's principal activities.

78.     Defendants did not limit or specify the amount of time Plaintiff was to spend caring for the canine while off-duty, but Defendants expected Plaintiff to appropriately care for the canine every day. Defendants did require Plaintiff to attend canine training sessions.

79.     Plaintiff and the canine were required to maintain sixteen (16) hours of certified training each month. At times, Plaintiff had to use his comp time, sick pay and vacation time, for training. Plaintiff was never compensated for the loss of his comp time.

80.     During the days that Plaintiff and Leia would train, the morning would be spent performing training, typically with other officers from other departments and then Plaintiff would spend the last half of his day working interdiction for the Task Force at I-40.

81.     Defendants knew that Plaintiff was performing work (i.e. caring for the canine) while off-duty, yet Defendants willfully refused to pay Plaintiff for this compensable time.

82.     Plaintiff frequently asked his commanding officers, including Buddy Bell, why he was not compensated for the amount of off-duty time he spent caring for the canine. Plaintiff was repeatedly told that they did not pay for this type of off-duty activity and refused to pay Plaintiff for the time he worked off the clock.

83.     Plaintiff specifically told his commanding officers that he was entitled to be

compensated for the amount of off-duty time he spent caring for the canine. Plaintiff was told by his supervisor that Director Tim Helldorfer was greatly concerned of being sued by Plaintiff for the failure to pay overtime for the off-duty time spent caring for the canine.

84. As a member of the West Tennessee Violent Crime & Drug Task Force, Plaintiff had jurisdiction to write and issue tickets, make arrests and perform the general functions of a law enforcement officer in Crockett, Dyer, Gibson, Haywood, Lake and Shelby counties. Plaintiff was instructed by his supervisors that, even though he was off the clock, during his commute to/from his home to I-40, he was to "make stops" and issue tickets for any traffic violations that he witnessed in any of these counties, during his commute to and from Dyersburg, Tennessee.

85. On numerous occasions Plaintiff wrote and issued tickets to motorists for traffic violations he witnessed while commuting to and from his home. Each of these tickets were written while off the clock.

86. By requiring Plaintiff to make stops during his commute, Defendants worked Plaintiff "off the clock." Plaintiff was not compensated for time spent "patrolling" during his travel time to and from his home in Dyersburg, Tennessee. Further, Plaintiff was not compensated for the time spent off the clock writing tickets and then traveling to and filing the "issued" tickets with the appropriate county clerk.

87. Plaintiff was not compensated for all compensable overtime spent working.

88. The exact amount of unpaid overtime compensation owed to Plaintiff is not presently known to the Plaintiff, but will be determined through discovery.

89. During the entire time Plaintiff worked as a special agent in the Interdiction Unit of the Task Force, he was paid by Shelby County Government. Further, Plaintiffs health, vision

and dental insurance were through Shelby County Government and his insurance cards list Shelby County Government as the employer.

90.     Plaintiff was on the Shelby County Government pension plan.

91.     Defendants determined the work schedule for Plaintiff, directed his actions and activities, and kept the individual time records for hours worked by each employee. All employee time records were kept by Defendants.

92.     The Task Force maintained a local bank account, the funds of which were provided from fines and civil forfeitures from drug defendants prosecuted by the Task Force in Shelby County. The local bank account was created exclusively for use by the Task Force, which did not receive any money from the State Treasury.  The Joint Corporation Agreement further authorized the Task Force to acquire, hold and dispose of real and personal property. Property owned by the Task Force could be sold in the Task Force's discretion, with the proceeds of any sale being used for other Task Force activities.

93.     The Task Force was also financed by monies received from federal grants, including the Edward Byrne Memorial Justice Assistance Grant administered by the Department of Justice, Office of Justice Programs. Applicants for Edward Byrne Memorial Justice Assistance Grants' are required to certify their compliance with all applicable federal laws at the time of application.

94.     The Department of Justice, Office of Justice Programs, requires the Applicant to certify under its "Standard Assurances" that the Applicant hereby assures and certifies that it will comply with all applicable Federal statutes, regulations, policies, guidelines, and requirements.

95.     The Office of Justice Programs, in the application for funding, strongly encourages applicants to review the information pertaining to the requirements, compliance with

all Federal statutes, regulations, policies, guidelines, and requirements and strongly encourages them to review and consider them carefully prior to making an application.

96. Upon being awarded an Edward Byrne Memorial Justice Assistance Grant, the Recipient is required to, again, accept and certify compliance with all Department of Justice assurances.

97. Defendant Task Force entered into Grant Contracts with the State of Tennessee, Department of Finance and Administration ("State"), with respect to the Edward Byrne Memorial Justice Assistance Grant Programs wherein the Task Force, as Grantee, and the State, as Grantor, agreed to specific provisions as to the administration of the federal grant funds.

98. Defendant Task Force agreed, in the Grant Contract, that the State would have no liability, with respect to the grant funding received, other than what was specifically set forth in the Grant Contract.

99. Defendant Task Force agreed in Grant Contracts, executed during the time period that Plaintiff was employed with the Task Force that it would comply with all applicable state and federal laws and regulations in return for receiving and usage of the grant funding.

100. In 2013, 2014 and 2015, Amy Weirich, District Attorney General, 30th Judicial District, executed the Grant Contracts on behalf of the Task Force as Grantee. In each of these Grant Contracts, the Task Force agreed that it would comply with all applicable state and federal laws and regulations in return for receiving and usage of the grant funding.

101. Among other things, the Edward Byrne Memorial Justice Assistance Grant Programs, grant money was used to pay the salaries and compensation of the Task Force employees.

102. Shelby County and the City of Memphis have contributed upwards of $9 million

dollars to the 30th Judicial District Attorney General Fund.

103. The West Tennessee Violent Crime & Drug Task Force is a wholly self-sustaining and self-funded unit, with all expense including overtime compensation, paid out of the proceeds from federal grants, fines and asset seizures.

104. Pursuant to 29 C.F.R. § 553.27(b), Defendants were required to pay Plaintiff all accumulated Comp Time at their average rate during the previous three (3) years or their final regular rate up on their separation from employment at the Task Force, whichever amount was higher. In lieu of comp time, the Defendants were required to pay Plaintiff a cash premium for each work week in which Plaintiff worked in excess of forty-three (43) hours.

105. As a result of their actions and the conduct described above, Defendants have violated Title 29 U.S.C. §206 and §207 from at least November 2, 2009 through April 20, 2016, in that:

a. Plaintiff worked in excess of forty (40) hours per week for the period of employment with Defendants;

b. No payments, and provisions for payment, have been made by Defendants to properly compensate Plaintiff for overtime wages, at the statutory rate of one and one-half times Plaintiff's regular rate for those hours worked in excess of forty (40) hours per week as provided by the FLSA; and

c. Defendants have failed to maintain proper time records as mandated by the FLSA.

106. At all times material hereto, Defendants failed and continue to fail to maintain proper time records as mandated by the FLSA. By failing to accurately record, report, and/or preserve records of hours worked by Plaintiff, Defendants have failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practice of employment, in violation of the FLSA, 29 U.S.C. § § 201 *et. seq.*

107. The foregoing conduct on the part of Defendants constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a) as Defendants knew, or showed reckless disregard for the fact that its compensation practices were in violation of federal law.

108. The actions of the Defendants in failing to pay Plaintiff for his overtime were willful.

109. The form setting forth the payroll terms under which Plaintiff was hired indicated that his Fair Labor Standards Act status was "non-exempt" See Exhibit J attached and incorporated by reference as if copied verbatim herein.

110. The West Tennessee Violent Crime and Drug Task Force Policy and Procedures manual provided to Plaintiff indicated that the Drug Task Force would follow the Fair Labor Standards Act provision regarding payment of compensatory time to law enforcement personnel. See Exhibit G, selected pages from the manual, attached and incorporated by reference herein.

111. The Drug Task Force had no written policy and procedure regarding compensation to Drug Task Force canine handlers employed by the Drug Task Force, including Plaintiff Rhea, for time spent caring for the canine before February 14, 2016.

112. The formula for compensation contained in the written policy regarding compensation to Drug Task Force canine handlers employed by the Drug Task Force which was adopted on February 14, 2016, was arrived at by arbitrary means, is unreasonable, and does not accurately reflect the amount of time necessary for canine handlers to care for and train the canines.

## CAUSES OF ACTION

## COUNT 1 – FAIR LABOR STANDARDS ACT

113. Plaintiff re-avers and incorporates paragraphs 1 - 59 above as if fully set forth

herein.

114.    Plaintiff was owed overtime compensation at a rate of not less than 1.5 times his regular rate of pay for all hours worked in excess of forty (40) hours for each seven-day work period. 29 C.F.R. § 553.230.

115.    During the past three (3) years, Defendants have willfully, intentionally and repeatedly violated the FLSA by failing to keep accurate records showing all the time it permitted or required Plaintiff to work, which resulted in the denial of compensation, either at a regular rate or an overtime premium rate for all time worked in excess of forty (40) hours in a workweek, as required by the FLSA.

116.    During the past three (3) years, Defendants have willfully and intentionally violated FLSA by permitting or requiring Plaintiff to perform work in excess of forty (40) hours a week without paying him any overtime compensation for this time.

117.    Upon his separation from the Task Force, Defendants were required to pay Plaintiff for all unused compensatory time period. 29 C.F.R. § 553.27. In the alternative, Defendants were required to pay Plaintiff an overtime premium each pay period.

118.    As a result of Defendants illegal and intentional actions, Plaintiff has suffered lost wages and benefits, loss of pension, humiliation, irreparable loss of enjoyment of life, emotional distress, and loss of job-related benefits.

119.    The willful and wanton nature of Defendants' conduct, in disregard of Plaintiff's rights, is such that Plaintiff is entitled to punitive damages as a result.

120.    Defendants failed and refused to compensate Plaintiff in accordance with the overtime provisions of the FLSA. Defendants were well aware of their obligation to pay Plaintiff overtime, and their failure and refusal to do so was willful and not in good faith.

Plaintiff also seeks attorneys' fees, costs and expenses of the litigation pursuant to the Fair Labor Standards Act, as well as interest on any judgment.

**WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:**

1.      That Defendants be served with this Complaint and compelled to Answer within the time prescribed;

2.      Declaring, pursuant to 28 U.S.C. §§2201 and 2202, that the acts and practices complained of herein are in violation of the maximum hour provisions of the FLSA;

3.      Awarding Plaintiff overtime compensation in the amount due to him for Plaintiff's time worked in excess of forty (40) hours per week;

4.      Judgment against Defendants that its violations of the FLSA were willful;

5.      Awarding Plaintiff liquidated damages in an amount equal to overtime award;

6.      Awarding Plaintiff reasonable attorney's fees and costs and expenses of the litigation pursuant to 29 U.S.C. §216(b);

7.      Awarding Plaintiff pre and post-judgment interests;

8.      Awarding Plaintiff all damages to include back pay and front pay that are available to them under the law;

9.      That the Defendants be permanently enjoined from allowing such discrimination to occur in the future with respect to the treatment of any human being;

10.     That at the hearing of this cause, Plaintiff be awarded such compensatory sums as will fully compensate him for the wrongful acts of Defendants, in an amount to be determined at trial, but not less than $100,000.00. This claim includes but is not limited to claims for back pay, front pay or reinstatement, mental and emotional distress, and embarrassment and humiliation;

11.     That at the hearing of this cause, Plaintiff be awarded such punitive damages as

will punish Defendants intentional, malicious, reckless and wanton conduct and serve to deter others similarly situated from engaging in similar illegal conduct, in an amount not to exceed $250,000.00.

12.     An order requiring Defendants to preserve all electronically stored information relevant to this lawsuit;

13.     That this Court find that Defendants unlawfully terminated Plaintiff in violation of T.C.A. §50-2-103(h) and the common law protection against retaliatory discharge;

14.     That this Court award to Plaintiff, in lieu of reinstatement, front pay and benefits until such time as he finds comparable employment;

15.     That this Court award Plaintiff all wages and other benefits, including back pay and damages, to fully compensate him for loss of earnings and fringe benefits, plus prejudgment interest, which he would have received but for the discriminatory treatment by Defendants, up to the date he acquired similar employment; and

16.     That this Court award Plaintiff any and all such other and further relief, both general and specific, as the Court deems just and equitable and to which he is entitled at law and equity.

PLAINTIFF DEMANDS A TRIAL BY JURY WHEN THE ISSUES ARE JOINED HEREIN.

<div style="margin-left:40%;">

**HEATON AND MOORE, P.C.**

By:     /s/ William C. Sesssions, III
        William C. Sessions, III (TN #15017)
        Attorney for Plaintiff
        44 North Second Street, Suite 1200
        Memphis, Tennessee  38103
        Ph.:  (901) 526-5975 Ext. 563
        File No: WS-50522

</div>